UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TRACEY ANN BELL,                              16-CV-0193-LJV-MJR
                                              REPORT AND RECOMMENDATION

                          Plaintiff,

            v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

                          Defendant.
_____

        The Plaintiff, Tracey Ann Bell, seeks review of the Commissioner of Social

Security's decision denying her application for Social Security Disability Insurance

benefits (SSDI) under the Social Security Act (the Act).  The Plaintiff claims that she is

"disabled" within the meaning of the Act because she suffers from back and leg pain, as

well as memory loss and cognitive deficits.  The Commissioner concluded, however, that

the Plaintiff is not "disabled" and that, as a result, she is not entitled to benefits.  This

lawsuit followed.  The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

        The Honorable Lawrence J. Vilardo referred this case to the undersigned pursuant

to 28 U.S.C. § 636(b)(1)(B) to prepare a report and recommendation on any dispositive

motions.  *See* Docket No. 7.  The parties filed cross-motions for judgment on the

pleadings, and the Plaintiff filed a "notice of no response" to the Commissioner's motion.

*See* Docket Nos. 6 (Pl. Br.), 9 (Def. Br.) & 10 (Pl. Reply).

---

[1] At the time this case was filed, the Acting Commissioner of Social Security was Carolyn W. Colvin.  Nancy A. Berryhill has since become the Acting Commissioner of Social Security.  Ms. Berryhill is therefore "automatically substituted" as the Defendant in this case.  Fed. R. Civ. P. 25(d).  For simplicity, the Court refers to the Defendant only as "the Commissioner."

For the reasons stated below, the Court recommends that the Plaintiff's motion for judgment on the pleadings be denied, and that the Commissioner's cross-motion for judgment on the pleadings be granted.

**BACKGROUND**

**A. Procedural History**

The Plaintiff filed an application for SSDI on August 22, 2012, alleging that, as of August 5, 2011, she was "disabled" within the meaning of the Act.  Tr. 127-28.[2]  The Commissioner denied the Plaintiff's application.  Tr. 79.  The Plaintiff then requested a hearing before an administrative law judge (ALJ), Tr. 86-87, and, on February 6, 2014, ALJ Bruce R. Mazzarella conducted a hearing at which the Plaintiff was represented by counsel.  Tr. 30-71.

On April 11, 2014, the ALJ found, for the reasons discussed below, that the Plaintiff was not "disabled" within the meaning of the Act.  Tr. 18-25.  On January 6, 2016, the Social Security Administration's Appeals Council denied the Plaintiff's request for review.  Tr. 1.  The ALJ's decision therefore became the final decision of the Commissioner.  *Id.* The Plaintiff then filed this timely action for review.

**B. Summary of the Evidence**

The Court has reviewed the administrative record in its entirety but summarizes only the evidence relevant to the Court's recommendations.

The Plaintiff was born in 1968 and completed one year of college, as well as a number of training courses.  Tr. 136, 140.  Since 1993, she has worked as, among other things, a certified nursing assistant and a medical billing assistant.  Tr. 141.  The Plaintiff

---

[2]  Citations to "Tr. __" refer to the administrative record in this case.  *See* Docket No. 5.

last worked in 2010 as a call-service representative.  Tr. 39-40.  She has not looked for work since that time, but she did "look into" starting an online clothing store.  Tr. 42.

The Plaintiff lives with her husband, who helps her cook, clean, grocery shop, and do laundry.  Tr. 55-56.  The Plaintiff is an ordained minister and spends her time ministering to people in hospitals and nursing homes (Tr. 55), as well as attending church services several times per week.  Tr. 57.  The Plaintiff testified that she also fills her time by reading mystery novels and writing.  *Id.*

At the administrative hearing, the Plaintiff testified that the "biggest problem" that interferes with her ability to work was her inability to sit for long periods of time, a problem she attributed to pain in her back and left leg.  Tr. 42-43.  The Plaintiff testified that she has had this problem since approximately 2007, that the pain is constant, and that she attends physical therapy.  Tr. 43, 47.  The Plaintiff's primary-care physician, Dr. David Holmes, referred the Plaintiff to an orthopedic specialist for her pain.  Tr. 44.  The orthopedic specialist—whom the Plaintiff saw only once—did not recommend surgery, but he recommended that the Plaintiff lose weight and attend physical therapy.  Tr. 44-45.  (At the time of the hearing, the Plaintiff was 5'5" tall and weighed 285 pounds.  Tr. 34.)  The Plaintiff also received chiropractic treatment in 2011 and 2012.  Tr. 328 -334.

The Plaintiff testified that she took over-the-counter pain medications for her back and leg pain, and that she had also taken hydrocodone until sometime in 2013.  Tr. 45.  In addition, the Plaintiff uses a cane on "real bad days," as well as a heating pad and a pillow.  Tr. 46.

The Plaintiff testified that, after her back and leg pain, her "next biggest problem" was memory loss.  Tr. 50.  The Plaintiff attributed this problem to a 2001 car accident,

although she testified that her memory loss "really started progressing once [she] had [a] splenectomy done" in October 2012.  Tr. 50.  The Plaintiff testified that her memory loss—which she classified as short-term and intermediate—manifested itself in forgetting to turn off the gas on the stove; leaving the water running; and "get[ting] stuck" when she writes, claiming that "trying to . . . formulate the words to put it together, to make sense, sometimes it could get hard."  Tr. 51-52, 63.

Approximately three weeks after her splenectomy (Tr. 152), the Plaintiff underwent a consultative psychiatric evaluation by Dr. Gregory Fabiano, a psychologist.  Tr. 244-48.  At her evaluation, the Plaintiff reported sleep problems, an inconsistent appetite, and "some problems with her memory since she had a car accident in 2001 and seizures in 2002."  Tr. 245.  The Plaintiff told Dr. Fabiano that "I do have problems with memory.  I get stuck with words.  I can't remember where I put things.  I have to think for a while when I misplace something."  *Id.*  Dr. Fabiano reported, however, that the Plaintiff "did not endorse severe impairments due to these problems with her memory."  *Id.*  In addition, Dr. Fabiano's evaluation of the Plaintiff's "recent and remote memory skills" found that they were "[i]ntact."  Tr. 246.  Specifically, Dr. Fabiano reported that the Plaintiff "could recall 3 of 3 objects immediately and 3 of 3 objects after five minutes.  She could remember 5 digits forward fashion and 5 digits in a backwards fashion."  *Id.*  Dr. Fabiano also reported that the Plaintiff's "[i]ntellecutal functioning appeared average," and that her "general fund of information appeared appropriate to experience."  *Id.*  In his medical source statement, Dr. Fabiano opined that "[t]he results of [his] examination do not appear to be consistent with psychiatric problems that would be significant enough to interfere with the claimant's ability to function on a daily basis."  Tr. 247.  Dr. Fabiano concluded

that the Plaintiff's prognosis was "good given continued medical follow up and care."  Tr. 248.

On November 7, 2012, State agency physician Dr. J. Echevarria reviewed the Plaintiff's medical records and reported that the Plaintiff "has had no psychiatric hospitalizations, no outpatient treatment, [and] no psychotropic medications."  Tr. 283. Dr. Echevarria concluded that the Plaintiff has no medically-determinable psychiatric impairments.  Tr. 271.  In addition, Dr. Echevarria concluded that the Plaintiff did not have "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain" that would be evidenced by memory impairment.  Tr. 272.

In May 2013, Dr. Holmes (the Plaintiff's primary care physician) referred the Plaintiff for a neurological consultation with Dr. Beja Ajtai.  Tr. 372.  The Plaintiff told Dr. Ajtai that "[s]he may forget recent content of conversation," and that "[s]he also has been having problems expressing herself at times."  *Id.*  The Plaintiff also told Dr. Ajtai that she "has been doing some absentminded things at home," such as "leaving the stove burning repeatedly or water running, and oftentimes she has been misplacing things as well."  *Id.* Dr. Ajtai reported that, "[s]o far," the Plaintiff's memory problems have caused "no limitation of her everyday function," although he noted that "the problems have been obvious and annoying."  *Id.*  Finally, the Plaintiff reported that she is able to take care of housework and chores, and that she has "no problem with driving."  *Id.*  The Plaintiff also reported "feel[ing] somewhat depressed and want[ing] people to leave her alone, but there has been no overwhelming depression."  *Id.*

Dr. Ajtai reported that the Plaintiff was "[p]ositive for," among other things, "memory loss [and] confusion."  Tr. 373.  After conducting a neurological exam, Dr. Ajtai observed

that the Plaintiff "is fully awake, alert, and oriented to self, time, place and person. . . . Memory cognition testing reveals a MoCA score of 21/30, she had 1/5 delayed recall, and also had attention, executive and abstract cognition deficits."[3]   Tr. 374.   Dr. Ajtai's assessment was that the Plaintiff "has been having short-term memory lapses and absentmindedness" and that, "on cognitive evaluation, she indeed exhibited delayed recall difficulties."  Tr. 374.  Dr. Ajtai therefore ordered a brain MRI.  After the MRI, Dr. Ajtai reported that "the brain parenchyma itself is unremarkable," and that "[t]here is no cerebral volume loss, stroke, or space-occupying lesion."  Tr. 376.   Dr. Ajtai reported seeing "significant enlargement of the Meckel caves," *id.*, and ordered a second MRI.  Tr. 378.   After the Plaintiff's follow-up visit, Dr. Ajtai's concluded that, for the Plaintiff's cognitive difficulties, he "would just suggest regular brain exercises" and that she "remain on her vitamin supplementations."  Tr. 378.  The record does not show any further follow-ups with Dr. Ajtai.

Finally, in addition to the issues described above, the Plaintiff testified that she used to have seizures but that she had not had once since 2004.  Tr. 52.  At the time of the hearing, the Plaintiff did not take any medication for seizures, and her physician allowed her to drive.  Tr. 52-53.

---

[3] "The Montreal Cognitive Assessment (MoCA) was designed as a rapid screening instrument for mild cognitive dysfunction.  It assessed different cognitive domains: attention and concentration, executive functions, memory, language, visuoconstructional skills, conceptual thinking, calculations, and orientation . . . The total possible score is 30 points; a score of 26 or above is considered normal."  *Montreal Cognitive Assessment (MoCA)*, U.S. Dep't of Veterans Affairs, https://www.parkinsons.va.gov/consortium/moca.asp (last visited October 20, 2017).

## DISCUSSION

### A. Scope of Judicial Review

The Court's review of the Commissioner's decision is deferential. The Act provides that the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. § 405(g)—that is, so long as they are supported by "such relevant evidence as a reasonable mind might accept to support [the] conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation marks omitted). This deference applies not only to the Commissioner's findings of "basic evidentiary facts, but also to inferences and conclusions drawn from those facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). It is, therefore, not the Court's job to "substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Instead, the Court's task is to ask whether "'the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Two related rules follow from the Act's standard of review. First, it is the "function of the [ALJ], not [the reviewing court] to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Secretary of HHS*, 705 F.2d 638, 642 (2d Cir. 1983). And second, "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

The Act's deferential standard of review, however, does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual

7

conclusions, even if they are supported by substantial evidence, must be "appl[ied] to [the] correct legal standard." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to do so "is reversible error." *Id.* Thus, the Commissioner's decision cannot be affirmed "when it is based on an erroneous view of the law, or [a] misapplication of the regulations, that disregards highly probative evidence." *Smith*, 17 F. Supp. 3d at 264.

## B. Standard for Determining "Disability" under the Social Security Act

The ultimate question in this case is whether the Plaintiff has a "disability" within the meaning of the Act. A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1). The Commissioner may conclude that a claimant is "disabled" "only if [the claimant's] physical or mental impairments are of such severity that [s]he is not only unable to do [her] previous work" but that she "cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for the work." *Id.* § 423(d)(2)(A). The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on those facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience." *Dumas v. Schweiker*, 712 F.2d 1545, 1550 (2d Cir. 1983).

To guide a decision-maker's assessment of whether a claimant is "disabled," the Commissioner has promulgated a "five-step sequential evaluation process."  20 C.F.R. § 1520(a)(4).

First, the Commissioner determines whether a claimant is "working" and whether that work "is substantial gainful activity."  20 C.F.R. §§ 404.150(b), 416.920(b).  If a claimant is engaged in substantial gainful activity, the Commissioner's inquiry is over: the claimant is "not disabled regardless of [her] medical condition or . . . age, education, and work experience."  *Id.*

Second, if a claimant is not engaged in substantial gainful activity, the Commissioner asks whether the claimant has a "severe impairment."  20 C.F.R.     §§ 404.1520(c), 416.920(c).  To make this determination, the Commissioner asks whether a claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  *Id.*  As with the first step, if a claimant does not have a "severe impairment," she is "not disabled," regardless of any other factors or considerations.  *Id.*

Third, if a claimant does have a "severe impairment," the Commissioner asks two additional questions: first, whether that severe impairment meets the Act's twelve-month durational requirement; and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is otherwise "equal to" an impairment listed in Appendix 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  If a claimant satisfies both requirements of step three, the Commissioner will find that she is "disabled" without regard to her "age, education, and work experience."  *Id.*

9

If a claimant does not have the "severe impairment" required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, however, the Commissioner "assess[es] and make[s] a finding about [a claimant's] residual functional capacity [RFC] based on all the relevant medical and other evidence" in the record. 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is the "most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The Commissioner's assessment of a claimant's RFC is then applied at steps four and five.

At step four, the Commissioner "compare[s] [the claimant's] [RFC] assessment . . . with the physical and mental demands of [her] past relevant work." 20 C.F.R. §§ 404.1520(f), 416.920(f). If, based on that assessment, the claimant is able to perform her past work, the Commissioner will find that the claimant is not "disabled" within the meaning of the Act. *Id.*

Finally, if a claimant cannot perform her past relevant work, the Commissioner considers whether, based on the claimant's RFC, as well as her "age, education, and work experience," the claimant "can make an adjustment to other work." 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). If the claimant can adjust to other work, she is not "disabled." *Id.* If, however, the claimant cannot perform any other work, she is "disabled" within the meaning of the Act. *Id.*

The claimant carries the burden throughout most of the process described above. However, if the claimant carries her burden through the first four steps—that is, "if [she] shows that [her] impairment renders [her] unable to perform [her] past work"—then "the burden shifts to the Commissioner to show there is other gainful work in the national

economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (internal citations and brackets omitted).

### C. The ALJ's Disability Determination

In this case, the ALJ found at the first step that the Plaintiff had not engaged in any substantial gainful activity since August 5, 2011, the alleged onset date of her disability. Tr. 20. The ALJ then found that the Plaintiff satisfied step two because she suffers from a number of severe impairments: degenerative disc disease of the lumbar spine; obesity; chronic immunity thrombocytopenic purpura with low platelet count; and a history of seizure disorder. *Id.* The ALJ also noted that the Plaintiff has been diagnosed with hypertension, but that her hypertension "is controlled with medication when [she] is compliant with taking it as directed." *Id.*

The ALJ then applied these findings at step three, where he concluded that the Plaintiff's "severe impairments" did not, either individually or in combination, meet or medically equal the impairments listed in Appendix 1 of the Commissioner's regulations. Thus, the ALJ was required to determine the Plaintiff's residual functioning capacity (RFC). As noted, a claimant's RFC is the "most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

The ALJ found that, even with her severe impairments, the Plaintiff "has the residual functional capacity to perform a reduced range of light work . . . in that [she] can sit for an eight hour day with normal breaks and meal periods, can stand or walk for an eight hour work day with only normal breaks and meal periods, can lift and carry up to twenty pounds occasionally and ten pounds frequently, can occasionally stoop, crouch and kneel and should not work at unprotected heights or operate motorized vehicles for work purposes." Tr. 21.

The ALJ based this RFC on his conclusion that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Tr. 21 – 22. The ALJ then thoroughly discussed the evidence supporting the Plaintiff's symptoms, noting several facts that, in the ALJ's view, undermined the Plaintiff's credibility. For instance, the ALJ observed that the Plaintiff "admitted to cooking, cleaning, shopping and laundry several times per week and showering and dressing daily." Tr. 22. The ALJ also noted that the Plaintiff "has not consulted with an orthopedist or spinal surgeon and has not continued care with a neurosurgeon or other specialist despite her complaint of chronic [back] pain." *Id.* The ALJ further observed that the Plaintiff's "work history is steady until 2010, which . . . raise[s] a favorable inference of an individual well-motivated to work within her capabilities," but the ALJ found that "that inference is outweighed by her lack of involvement with vocational rehabilitation and her vague assertion that she has been looking for work since 2010." Tr. 23. The ALJ also stated that, "[d]espite her complaints of constant pain and a level of 7 out of 10 and increasing to 10 out of 10 with sitting or standing too long, the [Plaintiff] has not had any prescription pain medication for over a year and merely takes over-the-counter medication, which she says do not relieve her pain. She relies on topical ointments, a lumbar pillow and a heating pad to relieve her pain," as well as a cane "when having a 'real bad day.'" Tr. 23. The ALJ found that the Plaintiff's reliance on these treatment options was "inconsistent with a 7 to 10 level of pain." Tr. 23.

As is particularly relevant to the Plaintiff's claims in this case, the ALJ also considered the Plaintiff's claim of short-term and intermediate memory loss.  The ALJ acknowledged that "neurological testing did show a slowed response," but, he pointed out, "MRI and objective testing was negative," and "no difficulties were noted with attention, concentration or memory on consultative examination."  Tr. 24.  In addition, the ALJ observed, the Plaintiff's "admitted daily activities are inconsistent with severe memory loss as she was noted to sing in the church choir and teach Sunday school and she testified that she enjoyed reading novels and attends to her congregation members."  *Id.*

In arriving at this RFC, the ALJ gave "great weight to Dr. Fabiano's opinion that the [Plaintiff] does not have limitations in the ability to perform the basic mental activities of work," and he gave "some weigh[t] to the State agency review physician who concluded that the [Plaintiff] does not have a medically determinable psychiatric impairment."  Tr. 24.

Applying that RFC, the ALJ found at step four that the Plaintiff was capable of performing her past relevant work as a medical voucher clerk, a claims clerk, and a telemarketer.  Tr. 25.  The ALJ therefore determined that the Plaintiff was not "disabled" within the meaning of the Act.  *Id.*

### D.  The Plaintiff's Challenges to the Commissioner's Decision

The Plaintiff raises several challenges to the ALJ's decision.  She first argues that the ALJ "erred in discounting [her] prior work record."  Pl. Br. at 12.  The Plaintiff then makes three arguments about the ALJ's findings as to her memory loss and cognitive deficits.   First, she argues that the ALJ erred in concluding that her memory loss and cognitive deficits are not severe impairments, *id.* at 16; she next argues that the ALJ did not "apply the proper technique"—that is, the so-called "special technique"—when

evaluating her memory loss and cognitive deficits, *id.* at 18; and, finally, she argues that the ALJ was required to, but did not, consider the "limitations caused by [her] memory loss and cognitive deficits in his RFC assessment." *Id.* at 19.

### 1. The Plaintiff's prior work record

The Plaintiff's first argument is that that ALJ improperly found that her work record was "outweighed by the fact that she did not engage in vocational rehabilitation and a 'vague assertion that she has been looking for work since 2010.'" Pl. Br. at 13 (quoting Tr. 23). Specifically, the ALJ concluded that:

> While I find the [Plaintiff] has severe impairments, I do not find her allegations of total disability to be consistent with the record as a whole. The [Plaintiff's] work record is steady until 2010, which does raise a favorable inference of an individual well-motivated to work within her capabilities. However, that inference is outweighed by her lack of involvement with vocational rehabilitation and her vague assertion that she has been looking for work since 2010.

Tr. 23.

The Plaintiff argues that this conclusion is inconsistent with case law and the Commissioner's regulations. Pl. Br. at 13.

The Second Circuit has reminded ALJs to "undertake[]" "a consideration of work history . . . with great care." *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998). This is because a claimant's work history can be interpreted in a number of different ways: "Just as a good work history may be deemed probative of credibility, poor work history may prove probative as well. Logically, poor work history could support one of two conclusions. On the one hand, just as a good work history may be deemed probative of credibility, a poor work history can reasonably be deemed to have the opposite significance. However, a poor work history might also support an inference that a

claimant's testimony of disability is truthful.  A claimant's failure to work might stem from her inability to work as easily as her unwillingness to work."  *Id.*  Given all this, "it bears emphasizing that work history is just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony."  *Id.  See also* 20 C.F.R.      § 404.1529(c)(2) ("We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by [the Commissioner's] employees and other persons.")

As the Commissioner correctly frames the issue, the Plaintiff "asserts that her good work history should have translated into a finding of credibility in evaluating her subjective symptoms and complaints."  Def. Br. at 19.  *See* Pl. Br. at 13 ("It is well established that a good work record lends itself to a finding of credibility when evaluating a claimant's subjective symptoms and complaints.") (footnote omitted).  But as discussed above, good work history does not necessarily result in a favorable credibility finding; rather, it is "just one of many factors" that an ALJ must consider when assessing credibility.  *Schaal*, 134 F.3d at 502.

The ALJ in this case properly considered the Plaintiff's work history, along with a number of other facts, when he assessed the Plaintiff's credibility.  To support his credibility determination, the ALJ considered the Plaintiff's work history, her history of vocational rehabilitation, and her efforts to find work.  Tr. 23.  But the ALJ also considered the Plaintiff's day-to-day activities, which included "sharing meal preparation, dishes, laundry, and grocery shopping," and he considered the fact that the Plaintiff "is an ordained minister [who] administers to others and engages in church services on a regular

basis." Tr. 24.  The ALJ also gave weight to the fact that the Plaintiff's "only conservative care has been physical therapy and chiropractic treatment," as well as the fact that her recent treatment options have included only over-the-counter medication, topical ointments, a lumbar pillow, and a heating pad.  Tr. 23.  The ALJ considered all of these facts and concluded that the Plaintiff's day-to-day activities "are consistent with light level exertion relieved by only over-the-counter medications and minor assistive devices."  Tr. 23.

The ALJ therefore properly treated the Plaintiff's work history as just one of many factors bearing on her credibility.  The ALJ explained what those factors were, and how he weighed them.  His credibility determination is therefore entitled to deference.  *See Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013) ("The ALJ set forth specific reasons for why [the claimant's] testimony was not credible and an ALJ's credibility determination is generally entitled to deference on appeal."); *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) ("[W]here the ALJ's decision to discredit a claimant's subjective complaints is supported by substantial evidence, [a reviewing court] must defer to his findings.")

### 2.  The Plaintiff's mental impairment-related challenges

The Plaintiff next makes several arguments about how the ALJ considered her memory loss and cognitive deficits.  Specifically, the Plaintiff argues that the ALJ erred (1) in not finding that the Plaintiff's memory loss and cognitive deficits were "severe impairments" at step two of the five-step evaluative process; (2) in not applying the so-called "special technique" when considering the Plaintiff's mental impairments; and (3) in not considering the Plaintiff's mental impairments in the ALJ's RFC assessment.

**1. Any error in not finding that the Plaintiff's mental impairments were "severe" was, at most, harmless because the ALJ considered those non-severe impairments when he assessed the Plaintiff's RFC.**

The Plaintiff's first and third arguments about her mental impairments—that the ALJ should have found them to be "severe" at step two, and that he failed to consider them in his RFC assessment—can be resolved together.

Step two of the Commissioner's five-step evaluative process acts largely as a screening mechanism; it provides a way for the Commissioner to "identy[] at an early stage those claimants whose medical impairments are so slight that it is unlikely that they would be found to be disabled." *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987).

It is for this reason that many courts have concluded—and the Second Circuit has at least suggested—that "error at step two in determining the severity of impairments is harmless if the ALJ finds at least one other severe impairment and continues through the sequence of the disability analysis because the non-severe impairments can later be considered at the RFC stage." *Howard v. Comm'r*, 203 F. Supp. 3d 282, 297-98 (W.D.N.Y. 2016) (collecting cases). *See Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) ("Even if we were to reach the merits of [the plaintiff's step-two] argument," which he had waived, "we would not identify error warranting remand because the ALJ did identify severe impairments at step two, so that [the plaintiff's] claim proceeded through the sequential evaluation process.")[4]

---

[4] A number of courts have recognized an exception to this harmless error rule in cases where the ALJ failed to apply the so-called "special technique" for mental impairments. *See, e.g., Kennerson v. Astrue*, 2012 WL 3204055, at *15 (W.D.N.Y. Aug. 3, 2012) ("Courts have held that the failure to apply the special technique is not harmless error."); *Howard*, 203 F. Supp. 3d at 297-98 (collecting cases for the proposition that the harmless error doctrine "does not always apply, especially in relation to a mental impairment"). Because, as discussed below, the Court concludes that the ALJ was not required to apply the special technique, this exception to the harmless error rule does not apply.

Thus, the ALJ's failure to find that the Plaintiff's memory loss and cognitive deficits are "severe impairments" is harmless so long as the ALJ considered those non-severe impairments in his RFC assessment.  *See Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (noting that it is "legal error" for an ALJ to determine a claimant's RFC "without accounting for any limitations arising from her mental impairment that were established by substantial evidence in the record," even when the ALJ finds that the claimant's "mental impairments [are] nonsevere"); 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe []' . . . when we assess your [RFC]."); 20 C.F.R. § 416.945(a)(2) (same).

The ALJ did not include any mental limitations in his RFC assessment, but he did consider evidence of mental impairments when formulating his RFC, and he concluded that those impairments did not impose any limitation on the Plaintiff's ability to work.  Tr. 24.  The ALJ's conclusion was supported by substantial evidence.  *Parker-Grose*, 462 F. App'x at 18.  Thus, remand is not required.  *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) ("[T]he Step Four residual functional capacity finding did not explicitly include [the plaintiff's] non-exertional functional limitations.  However, Step Four findings need only afford an adequate basis for meaningful judicial review, apply the proper legal standards, and be supported by substantial evidence.") (quotation marks and editorial brackets omitted); *Rogers v. Berryhill*, 2017 WL 3483666, at *4 (W.D.N.Y. Aug. 15, 2017) (remanding where the ALJ's RFC analysis "does not discuss [plaintiff's] depression or explain why the RFC lacked any related mental limitations").

_____

The ALJ relied on several pieces of evidence to conclude that the Plaintiff's mental impairments did not give rise to any limitations that must be included in her RFC. Specifically, the ALJ considered the Plaintiff's self-reported short-term and intermediate memory loss, and he noted that "neurological testing . . . show[ed] a slowed response." Tr. 24. But the ALJ also observed that "MRI and objective testing were negative," and that "no difficulties were noted with attention, concentration or memory on consultative examination." *Id.* In addition, the ALJ found that the Plaintiff's daily activities—for example, singing in her church's choir, teaching Sunday School, and reading novels— were "all inconsistent with severe memory difficulty." *Id. See also Huyck Colvin*, 2017 WL 2957867, at *9 (W.D.N.Y. Jul. 11, 2017) (collecting cases for the proposition that "[a]ny suggestion . . . that the ALJ was not permitted to consider [the plaintiff's] daily activities in formulating her RFC is incorrect") (citations omitted). The ALJ also gave "great weight" to Dr. Fabiano's opinion that the Plaintiff "does not have limitations in the ability to perform the basic mental activities of work." Tr. 24. Finally, the ALJ gave "some weight" to the State agency review physician, "who concluded that the [Plaintiff] does not have a medically determinable psychiatric impairment." *Id. See Henry v. Astrue*, 32 F. Supp. 3d 170, 181 (N.D.N.Y. 2012) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability.") (citations omitted). Based on this evidence, the ALJ concluded that the Plaintiff "has no mental limitation that would limit the semi-skilled work of her past." Tr. 24.

The evidence the ALJ considered is sufficient for "a reasonable mind to accept the conclusion[] reached by the Commissioner," *Silvers*, 67 F. Supp. 3d at 574—that is, that the Plaintiff's mental impairments did not result in "any limitation[]" that must be "account[ed]" for in the Plaintiff's RFC. *Parker-Grose*, 462 F. App'x at 18. Thus, any error in not considering the Plaintiff's mental impairments at step two was harmless because those impairments were considered during the ALJ's RFC analysis.

### 2. The ALJ was not required to apply the "special technique" because the Plaintiff did not present sufficient evidence to raise a colorable claim that she suffers from a medically-determinable mental impairment.

At the second and third steps of the Commissioner's five-step evaluative process, an ALJ must consider whether to apply the so-called "special technique" for mental impairments. 20 C.F.R. § 404.1520a(a). "This technique requires the reviewing authority to determine first whether the claimant has a 'medically determinable mental impairment.'" *Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1520a(a)). To do so, the ALJ must "evaluate [a claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [she] ha[s] a medically determinable mental impairment(s). . . . If [the ALJ] determine[s] that [the claimant] ha[s] a medically determinable mental impairment(s), [the ALJ] must specify the symptoms, sign, and laboratory findings that substantiate the presence of the impairment(s) and document [his] finding." 20 C.F.R. § 404.1520a(b)(1). If the ALJ concludes that a claimant does have a medically-determinable mental impairment, the ALJ must then apply the "special technique" by "rat[ing] the degree of functional limitation resulting from the impairment(s)." *Id.* § 404.1520a(b)(2). The special-technique analysis is, therefore, a two-step process. The ALJ must first decide whether a claimant has a medically-determinable mental

impairment.  If the claimant does have a medically-determinable mental impairment, the ALJ must then rate the functional limitations caused by that impairment.

The Commissioner argues that the ALJ in this case was not required to apply the special technique because the Plaintiff "did not allege a disabling mental impairment, she denied any history of inpatient or outpatient mental health treatment, and no mental health provider opined that she could not work."  Def. Br. at 16.  Moreover, the Commissioner argues, the ALJ "adopted the findings of the State agency medical expert in assessing Plaintiff's mental impairments."  *Id.*  In other words, by arguing that the ALJ need not have employed the special technique, the Commissioner argues that the Plaintiff did not have a "medically determinable mental impairment."

The Second Circuit does not appear to have addressed the question of when an ALJ must apply the special technique.  But the court has suggested that the threshold is not high, and that the ALJ "ha[s] a responsibility to explain, based on the record," whether "the claimant suffered from a medically determinable mental impairment" "once the issue [is] raised."  *Aung Winn v. Colvin*, 541 F. App'x 67, 70 (2d Cir. 2013) (citing *Kohler*, 546 F.3d at 266).  *See also George v. Astrue*, 451 F. App'x 767, 768 (10th Cir. 2011) (Gorsuch, J.) (remanding where the "evidence suggest[ed] a medically determinable mental impairment," but where "the ALJ made no mention of it" and also failed to apply the special technique, noting that "the ALJ has not made *any* factual findings—one way or the other—about the existence, severity, or functional limitations, if any, imposed by [the claimant's] mental condition") (emphasis in original); *Dennis v. Colvin*, 2013 WL 4735572, at *5 (D. Ore. Aug. 30, 2013) ("Under the [special technique], if the claimant presents a colorable claim of mental impairment, the ALJ must determine whether the

21

claimant has a medically determinable mental impairment, rate the degree of functional limitations for four functional areas, and determine the severity of the mental impairment.") (citing *Keyser v. Comm'r*, 648 F.3d 721, 725 (9th Cir. 2011)); *Bryant v. Astrue*, 2008 WL 2037421, at *10 (E.D.N.C. May 12, 2008) ("Courts have held that where a claimant presents a colorable claim of mental impairment, the ALJ must have a Psychiatric Review Technique form completed and included in the record or incorporate its analysis into his findings and conclusions.") (citing *Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005); *Stambauah v. Sullivan*, 929 F.2d 292, 296 (7th Cir. 1991)).

The record before the ALJ did not raise a "colorable claim," *id.*, that the Plaintiff might have a medically determinable mental impairment.  Any evidence of a mental impairment came almost entirely the Plaintiff's testimony: the Plaintiff testified, for example, that she would forget to turn the gas off on her stove; that she left the water running; that she would "lose things," Tr. 52; that "[i]t takes [her] longer trying to figure out things"; and that she "sometimes" "get[s] stuck" "trying to just put the words, to formulate the words to put it together, to make sense."  Tr. 63.  The Court does not doubt that such difficulties are frustrating, but this testimony, standing alone, does not give rise to a colorable claim of a *medically-determinable* mental impairment.  Dr. Ajtai's "[r]eview of systems"—which was "[p]ositive for memory loss [and] confusion," Tr. 373—does not change this conclusion.  *See* 20 C.F.R. § 404.1520a(b)(1); *id.* at § 404.1521 ("[A] . . . mental impairment must be established by objective medical evidence from an acceptable medical source.  We will not use your statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).")  Indeed, the *only* evidence in the record addressing whether the Plaintiff has a medically-determinable mental

impairment—the Psychiatric Review Technique from the State agency medical consultant—concluded that the Plaintiff has no medically-determinable mental impairments.  Tr. 271.

The Plaintiff introduced no evidence that colorably suggests that she has a medically-determinable mental impairment, at least as the Commissioner's regulations define that term.  Because the Plaintiff did not do so, the ALJ did not err in not applying the special technique.  *See Moore v. Astrue*, 2013 WL 935855, at *7 (N.D.N.Y. Feb. 5, 2013) ("As [the plaintiff] failed to present any medical evidence demonstrating mental impairments, other than this own subjective testimony, he failed to establish a colorable impairment requiring application of the special technique") (citing 20 C.F.R. § 404.1508 and *Fountain v. R.R. Ret. Bd.*, 88 F.3d 528, 532 (8th Cir. 1996)).

## CONCLUSION

For the reasons stated above, the Court recommends that the Plaintiff's motion for judgment on the pleadings be denied, and that the Commissioner's cross-motion for judgment on the pleadings be granted.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 72. Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE***

23

**RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law, and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance.  *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."  ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED.**


Dated: October 24, 2017          /s/ Michael J. Roemer_____
     Buffalo, New York          MICHAEL J. ROEMER
                                    United States Magistrate Judge